1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11    BURT CAMENZIND, an individual,          No. 2:19-cv-00632-MCE-AC

12                 Plaintiff,

13         v.                                 **MEMORANDUM AND ORDER**

14    CALIFORNIA EXPOSITION AND
      STATE FAIR, RICK PICKERING, in his
15    official capacity as General Manager of
      California Exposition and State Fair;
16    DOES 1-10, inclusive,

17                 Defendants.

18

19         Through the present action, Plaintiff Burt Camenzind ("Plaintiff") asserts claims

20    against Defendants California Exposition and State Fair ("Cal Expo") and Rick Pickering

21    ("Pickering"), in his official capacity as General Manager of Cal Expo, (collectively,

22    "Defendants") arising out of Defendants' purported violation of his rights to free speech.

23    According to Plaintiff, Cal Expo's "Free Speech Activities Guidelines" in conjunction with

24    its "Code of Conduct" (collectively referred to as "the Guidelines") violate his rights under

25    the United States and California Constitutions both facially and as applied to him.

26    Plaintiff claims these policies prevented him from distributing religious literature and

27    coins (hereafter "leafleting") during the Hmong New Year Festival.  Presently before the

28    ///

                                              1

1    Court are the parties' Cross-Motions for Summary Judgment.  ECF Nos. 9, 11.[1]  For the

2    following reasons, both Motions are GRANTED in part and DENIED in part.

3

4                                    **BACKGROUND**[2]

5

6        **A.    Cal Expo's Rules**

7            Cal Expo is a large state-owned property in Sacramento County encompassing

8    approximately 800 acres, roughly 400 of which are fenced in and accessible through

9    gates.  The fenced in portion, where California holds its annual State Fair, is an area

10   rented out for hundreds of smaller events each year as well.  Outside Cal Expo's gates

11   are parking lots intertwined with various sidewalks which allow foot traffic to reach the

12   entrance.

13           Cal Expo purports to provide "reasonable access to its grounds . . . for

14   demonstrations for free speech activity."[3]  ECF No. 12-1 at 101.  It thus established the

15   Guidelines to regulate such expressive activities on that property.  Outside park gates,

16   Cal Expo established "designated free expression zones," which it defines as follows:

17                   A free expression zone is a designated area located on-site as
                     established by Cal Expo's chief executive officer (general
18                   manager), deputy general manager, or any individual
                     designated in writing by Cal Expo's chief executive officer, at
19                   which members of the public may be provided reasonable
                     access in accordance with these guidelines for purposes of
20                   conducting free speech activities.

21   ///

22   _____

23           [1] Because oral argument would not have been of material assistance, the Court ordered this
     matter submitted on the briefs.  E.D. Cal. Local Rule 230(g).

24           [2] The material facts are undisputed.  They are taken, primarily verbatim, from the parties' papers.

25           [3] The Guidelines explain that "'free speech activities' mean individual or group display of signs
     other than specifically allowed . . . ; picketing, leafleting, collection of signatures or marching and any
26   group activity involving the communication or expression, either orally or by conduct of views and/or
     grievances, and which has the effect and intent or propensity to express that view or grievance to others."
27   ECF No. 12-1 at 102.  "As used in [the] guidelines, neither the definition of or limitations on 'free speech
     activities' includes one-on-one voluntary discussions or individual wearing of buttons or symbolic
28   clothing."  Id.

ECF No. 12-1 at 102.[4]

The Guidelines explain why this approach was taken:

> It is the policy of Cal Expo . . . to allow free speech activity wherever said activity is not inconsistent with the normal operations or activities of Cal Expo. Cal Expo finds, however that due to the unique nature of the grounds of Cal Expo, there is limited access necessitating creation of free expression zones. Cal Expo specifically finds that the buildings and grounds comprising Cal Expo's grounds are generally surrounded by parking areas under the control of Cal Expo, but which areas become congested with numerous vehicles during events. Cal Expo further finds that pedestrian traffic is generally confined to narrow walkways to and from these parking areas to the various gates of the fairgrounds and that the designated free expression zones are designed to balance the interests of those engaged in free speech activity and being given reasonable access to the patrons of events of Cal Expo, and the safety of the patrons and prevention of accidents or congestion which could lead to injury."

> Further, Cal Expo finds that these guidelines in the providing of free expression zones are balanced to protect the interests of patrons attending events upon Cal Expo's fairgrounds from inappropriate activity or conduct by those engaged in free speech activity, with the interest of those engaged in such free speech activities. Cal Expo's solution to this balancing of interests is designation of free expression zones and restrictions on time, place and manner of said expressions to ensure reasonable access by those engaged in free expression activity to those attending the fairgrounds, while protecting the overall safety of the public. In addition, Cal Expo finds that for the annual State Fair, for-rent booths are available for rent to anyone on a first-come, first-serve basis in addition to free expression zones.

ECF No. 12-1 at 102-03. Cal Expo elaborated as to how it would designate such zones:

> These [free expression] zones shall be selected by Cal Expo. The area selected by Cal Expo shall be selected to provide maximum reasonable access by those involved in First Amendment activities to patrons of Cal Expo, commensurate with public safety as well as the safety of those individuals engaged in such activity, and shall interfere to the minimal extent possible with the free flow and passage of patrons to and from the parking areas and Cal Expo's fairground.

///

_____

[4] Because "free speech activities" do not include one-on-one voluntary discussions, such interactions need not be confined to free expression zones and may occur anywhere throughout the Cal Expo property. It is only when, as is relevant here, an individual wishes to hand out leaflets or pamphlets, that his or her activity must occur within one of these zones.

1    ECF No. 12-1 at 103.  Each of these free expression zones comprise 36 square feet.

2    See ECF No. 12-1 at 104 ("[A]n exclusive area within the zone, six feet by six feet, will

3    be assigned for use by an individual or a group.").

4         Of course, "leaflets, pamphlets or other materials are to be distributed from the

5    confines of the free expression zone space and not placed on cars, left unattended at

6    gates or other locations on the property."  In addition, as indicated above, aside from the

7    free expression zones, leafleters may also, depending on the circumstances, rent a

8    booth inside the gates if they want to engage in free speech activities therein.  ECF

9    No. 12-1 at 103, 105.

10         Finally, under some circumstances, pre-registration is required:

11    
12         Organizations or affiliated groups of persons desiring to engage in free speech activity on-site in large groups should register with Cal Expo prior to the event.  For purposes of these guidelines, it shall be presumed that a group of more than 25 protestors shall be a large group requiring a registration. Registration is not mandatory for affiliated persons not meeting the definition of a large group.  However, early registration may allow the applicant to select the desired free expression zone which are allotted on a "first come, first serve basis."  The purpose of registration is not to censor in any way or review discretionarily the content of the speech involved, but to allow sufficient opportunity for Cal Expo to assign space for free speech expression zones.  Registration will be granted on a first-come, first serve basis.  A request for registration may be made 48 hours prior to the planned event, but not more than 30 days prior to planned event at the offices of Cal Expo.

20    ECF No. 12-1 at 103.  "Nothwithstanding the 48 hour registration requirement for large

21    groups, such a registration will not be required for persons or groups engaging in

22    spontaneous expression."  ECF No. 12-1 at 106.  "Spontaneous expression" in turn

23    means "expressive activity in response to events coming into the public knowledge

24    within the past forty-eight hours."  Id.

25         Violation of the Guidelines is grounds for ejection from the property and possible

26    arrest.  ECF No. 12-1 at 52, 107.

27    ///

28    ///

### B.    The Events Underlying This Case

On November 24, 2018, Plaintiff went to Cal Expo to attend the Fourteenth Annual Hmong New Year Festival.  Plaintiff's goal in attending the festival was to spread the message of Evangelical Christianity.  To facilitate conversations with festival attendees, Plaintiff brought with him leaflets and approximately 1,000 custom coins printed with religious information to hand out free of charge.

At the entry gate, Plaintiff spoke with Cal Expo Police Sergeant Caryn King, who informed him that handing out leaflets and/or coins inside of the event without permission would violate the Cal Expo Code of Conduct.[5]  Plaintiff nonetheless entered the festival and proceeded to hand out coins to attendees.  He estimates he handed out approximately 50 religious coins in one hour before an officer saw him doing so and ejected him from the property.

In January 2019, Plaintiff's counsel submitted a claim to California's Department of General Services.  That claim was rejected, after which Plaintiff initiated this action in Sacramento County Superior Court.  Defendants subsequently removed the case to this Court, and it is ripe for adjudication.

### STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

///

---

[5] Sergeant King also advised Plaintiff that he could fill out an application to engage in free speech activities, ostensibly to choose to use a free expression zone, but Plaintiff declined.  According to Defendants, it is preferred that individuals fill out an application to utilize a free expression zone for logistical purposes, but such applications are not required.  In any event, Sergeant King testified that she could not recall ever turning an applicant away.

1    Rule 56 also allows a court to grant summary judgment on part of a claim or

2   defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

3   move for summary judgment, identifying each claim or defense—or the part of each

4   claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.

5   Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

6   motion for partial summary judgment is the same as that which applies to a motion for

7   summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

8   Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

9   judgment standard to motion for summary adjudication).

10    In a summary judgment motion, the moving party always bears the initial

11   responsibility of informing the court of the basis for the motion and identifying the

12   portions in the record "which it believes demonstrate the absence of a genuine issue of

13   material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

14   responsibility, the burden then shifts to the opposing party to establish that a genuine

15   issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. Ltd. v.

16   Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co.,

17   391 U.S. 253, 288-89 (1968).

18    In attempting to establish the existence or non-existence of a genuine factual

19   dispute, the party must support its assertion by "citing to particular parts of materials in

20   the record, including depositions, documents, electronically stored information,

21   affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

22   not establish the absence or presence of a genuine dispute, or that an adverse party

23   cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

24   opposing party must demonstrate that the fact in contention is material, i.e., a fact that

25   might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

26   Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

27   Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also

28   demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the <u>onus</u> of proof is imposed." <u>Anderson</u>, 477 U.S. at 251 (quoting <u>Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Id.</u> at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. <u>Anderson</u>, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

Plaintiff contends that Cal Expo's restrictions on leafleting are unconstitutional both facially and as applied to him.  More specifically, Plaintiff takes the position that Cal Expo is a public forum and that the prohibition on leafleting inside of the gates, the application requirement to leaflet outside of the gates, and the relegation of such leafleting to free expression zones outside of the gates are not narrowly tailored to achieve a significant government interest.  Additionally, according to Plaintiff, Cal Expo's ///

7

policies in this regard fail to leave open ample channels of communication.[6]  Defendants

disagree, arguing that Cal Expo is a nonpublic forum and the rules are thus sufficiently

reasonable.  Defendants further maintain that their free speech restrictions nonetheless

survive under any standard of review.  The Court is not convinced that the parties'

treatment of the property as a whole is the correct approach.  It thus concludes that, for

the reasons set forth below, Cal Expo is comprised of both public and nonpublic fora and

that its respective rules are constitutionally sound given those designations.

### A.    Rules Governing Fora Analysis

In assessing a freedom of expression claim, this Court first "must identify the

nature of the forum, because the extent to which the Government may limit access

depends on whether the forum is public or nonpublic."  Hopper v. City of Pasco,

241 F.3d 1067, 1074 (9th Cir. 2001) (quoting Cornelius v. NAACP Legal Defense &

Educ. Fund, 473 U.S. 788, 797 (1985)).  Indeed, "the Government, 'no less than a

private owner of property, has power to preserve the property under its control for the

use to which it is lawfully dedicated.'"  Cornelius, 473 U.S. at 800 (quoting Greer v.

Spock, 424 U.S. 828, 836 (1976)).

The Supreme Court therefore "adopted a forum analysis as a means of

determining when the Government's interest in limiting the use of its property to its

intended purpose outweighs the interest of those wishing to use the property for other

purposes."  Id.  "[T]he two main categories of fora are public (where strict scrutiny

applies) and non-public (where a more lenient 'reasonableness' standard governs)."

Hopper, 241 F.3d at 1074.

Under the United States Constitution, a "traditional public forum" is an area that

"by long tradition or by government fiat [has] been devoted to assembly and debate."

---

[6] Defendants concede, as they must, that the Guidelines only require registration by large groups and not by individuals.  On the face of the Guidelines, then, the registration requirement is not constitutionally flawed.  The record is undisputed, however, that Plaintiff was repeatedly advised, as an individual, that he must fill out an application to utilize a free speech zone.  Accordingly, Plaintiff's as-applied challenge to the registration requirement is well taken.  See Watchtower Bible & Tract Soc'y of NY, Inc. v. Vill. of Stratton, 536 U.S. 150 (2002).  Plaintiff's Motion is thus GRANTED, and Defendants' Motion is DENIED on this point.

1  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).  This

2  includes places such as public streets, parks and sidewalks.  To determine whether a

3  particular site constitutes a public forum for purposes of the federal Constitution, courts

4  evaluate "(1) 'the actual use and purposes of the property, particularly status as a public

5  thoroughfare and availability of free public access to the area,' (2) 'the area's physical

6  characteristics, including its location and the existence of clear boundaries delimiting the

7  area,' and (3) 'traditional or historic use of both the property in question and other similar

8  properties.'"  Wright v. Incline Vill. Gen. Improvement Dist., 665 F.3d 1128, 1135 (9th Cir.

9  2011) (quoting ACLU of Nev. v. City of Las Vegas, 333 F.3d 1092, 1100-01 (9th Cir.

10  2003)).

11        The California Constitution's standard for determining whether a particular area is

12  a "public forum" is "[a] protective provision more definitive and inclusive than the First

13  Amendment."  Robins v. Pruneyard Shopping Ctr., 23 Cal. 3d 899, 908, 910 (1979).

14  Under the Liberty Speech Clause of the California Constitution, the "public forum"

15  doctrine is not limited to traditional public forums such as streets, sidewalks, and parks

16  or to sites dedicated to communicative activity such as municipal theaters.  Rather, the

17  test under California law is "whether the communicative activity is basically incompatible

18  with the normal activity of a particular place at a particular time."  Carreras v. City of

19  Anaheim, 768 F.2d 1039, 1045 (9th Cir.1985), abrogated on other grounds by

20  Los Angeles Alliance for Survival v. City of Los Angeles, 22 Cal. 4th 352 (2000).

21        The parties disagree as to how Cal Expo should be categorized, addressing their

22  arguments to the property as a whole, with Plaintiff arguing that the entire property is a

23  public forum while Defendants advocating to the contrary.  However, for instant purposes

24  Cal Expo is really delineated into two separate areas: (1) that area inside of the ticket

25  gates where events are held by private parties; and (2) that area outside of those gates

26  where people park, traverse the sidewalks to enter the venue, and can congregate

27  without entering the event itself.  The Court addresses each separately.

28  ///

**B.** **Inside the Gates**

      **1.** **Nonpublic Forum**

The Court concludes that the area inside the Cal Expo gates (i.e., the area utilized for the Hmong New Year Festival) is a nonpublic forum.[7]  Cal Expo has not historically been used as a venue for diverse and open speech.  It is not a park, street or thoroughfare traditionally open to the public.  Instead, it is operated as an event venue, primarily for private organizations to rent the premises to host their own exclusive events.  Otherwise, Cal Expo is closed most days.  Indeed, it is undisputed that the Hmong New Year Festival was sponsored by a private organization paying a substantial amount money (i.e., $40,000) for exclusive use of the facilities.

Moreover, the gated portion of the property is surrounded by fencing and is only accessible during specific hours by ticketed members of the public who are required to go through security.  Public pathways and streets do not pass through the fenced space, and it is not open generally to the public to congregate.  For all of these reasons, the gated portion of Cal Expo, where no free expression zones have been established, fails to qualify as a public forum under both the state and federal tests.

Plaintiffs have cited no on-point authority to the contrary.  In fact, the parties have not identified, nor has the Court found, any analogous case standing for the proposition that the portion of a public entertainment venue being rented by a private party for an exclusive event-specific purpose should be treated as a public forum such that leafleting would be permitted inside.  Quite the contrary.  In each of the cases raised before the Court here, the free speech challenges were brought with respect to the areas surrounding the venues (e.g., the adjacent parking lots and sidewalks) as opposed to the interior portions of the properties where a private event was being held.  See, e.g., Carreras, 768 F.2d 1039 (evaluating constitutionality of prohibiting solicitation in the

---

      [7] The Court does not consider the parties' suggestion that this area of Cal Expo is a public fora during the operation of the California State Fair.  While that position makes sense given that the State is in that case explicitly hosting an event open to its public, Plaintiff has not established standing with respect to the Fair.

1   parking areas and pedestrian walkways surrounding the city-owned Anaheim Stadium

2   and the exterior walkways of the city-owned Anaheim Convention Center as opposed to

3   inside the stadium or convention center); Kuba v. 1-A Agr. Ass'n, 387 F.3d 850 (2004)

4   (holding that the walkways and parking lots surrounding the State of California-owned

5   Cow Palace were a public forum); Park Mgmt. Corp. v. In Defense of Animals,

6   36 Cal. App. 5th 649, 653, 665 (2019) (concluding that the "exterior, unticketed areas of

7   [a privately owned] amusement park are a public forum" under the California Constitution

8   and noting that "there are no other areas within the amusement park available for free

9   expression, because the interior area is by ticketed admission only".)[8]  In none of those

10  cases did any plaintiffs contend—let alone did the courts hold—that individuals should

11  be permitted to purchase a ticket to the particular event as a passport of sorts to protest

12  freely or distribute materials inside.

13          Moreover, the most analogous out-of-circuit authority this Court has found

14  supports the conclusion that the interior portion of Cal Expo is non-public.  In Int'l Soc.

15  for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority, 691

16  F.2d 155, 161 (3d Cir. 1982), the court held that a state-owned racetrack and stadium

17  was a nonpublic forum.  As here, patrons were permitted inside of the facility to engage

18  in "pure or symbolic speech" and were "free to speak with anyone they choose and upon

19  any topic, . . . to wave pennants or [to] wear clothes that demonstrate a point of view."

20  Id. at 159.  Distributing literature or soliciting contributions was, however, prohibited.  Id.

21  at 158.  That court reasoned that the racetrack and stadium were distinguishable from a

22  park and did not resemble other sites historically created for the exchange of ideas.

23  Given its commercial purpose and the fact that the facilities were dedicated to

24  ///

25  ///

26  ///

27  _____

        [8] The Court finds Heffron v. Int'l Soc. For Krishna Consciousness, Inc., 452 U.S. 640 (1981),
28  inapposite to the instant analysis because that case involved a state fair, which is materially different from
    the facts of this case.

1  recreational use, the court concluded the venue was a nonpublic forum. Id. at 161 and

2  n.3. For the reasons already articulated, this Court agrees.[9]

3  **2.     Restrictions on Leafleting are Reasonable**

4  In this nonpublic forum, the government may still "not exclude speech where its

5  distinction is not reasonable in light of the purpose served by the forum . . . . "

6  Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 829

7  (1995) (quotation and citation omitted). Excluding speech inside of the gates is

8  reasonable here.

9  The purpose of the venue was a celebration of the Hmong New Year put on by a

10  private group to facilitate interaction between festival merchants, who paid to rent

11  booths, and festival attendees. This was not an event sponsored by the state to freely

12  promote public discourse or a rally or protest on a street corner or in a public park. This

13  was a private event open only to ticket holders at the cost of thousands of dollars to the

14  promoters. Against that backdrop, Plaintiff has not pointed the Court to any authority

15  supporting the conclusion that an individual's First Amendment rights guarantee him or

16  her the opportunity to distribute leaflets or other materials during such a private event

17  simply because the event organizers rented a public as opposed to a private property for

18  their venue. Quite the contrary, as discussed above, it appears that private events,

19  whether it be a circus or an amusement park, remain private beyond the gates, even if

20  those events take place on public property. See Carreras, 768 F.2d 1039; Kuba,

21  387 F.3d 850; Park Mgmt. Corp., 36 Cal. App. 5th 649; Soc. for Krishna Consciousness,

22

23  ─────────

    [9] This conclusion can also easily be reconciled with those cases evaluating the effect the
24  privatization of public places might have on First Amendment protections. See ACLU, 333 F.3d 1092;
    First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114 (10th Cir. 2002). Those
    cases are inapposite because they involved properties such as parks, sidewalks, streets, and
25  thoroughfares that had historically been treated as public fora, which is not the case here. Nor is this case
    similar to those instances where permit holders for events held in public parks were prohibited from
26  excluding other speakers from the forum. See Gathright City of Portland, Or., 439 F.3d 573 (9th Cir.
    2006). An exclusive event held in a privately leased venue is distinguishable from an open event held in a
27  public park, which is the epitome of a public forum. Anyone can come and go during an event held at an
    open park, and the park itself remains open during the duration of the event. The same is not true for an
28  exclusive event limited to ticketed participants. Accordingly, this is a distinction with a dispositive
    difference.

1  691 F.2d 155.[10]  Accordingly, the Court finds that Cal Expo's limitation on leafleting

2  inside the gates during privately funded and hosted events is constitutional.[11]

3      **C.    Outside the Gates**

4          **1.    Public Forum**

5      In applying the above framework to the area outside of the gates, this Court

6  concludes that the area is a public forum subject to reasonable time, place, and manner

7  restrictions.  The area outside of the gates is comprised of sidewalks and parking lots

8  open to the public.  It is simply not plausible to conclude that this area of the property is

9  a nonpublic forum, especially given the inclusion of designated free expression zones.

10  See Carreras, 768 F.2d 1039; Kuba, 387 F.3d 850; Park Mgmt. Corp., 36 Cal. App. 5th

11  649; Soc. for Krishna Consciousness, 691 F.2d 155.[12]

12          **2.    Restrictions on Leafleting are Reasonable Time, Place, and**
            **Manner Restrictions**
13

14      In public fora, restrictions on the time, place, or manner of speech are reasonable

15  provided they are "'justified without reference to the content of the regulated speech, that

16  they are narrowly tailored to serve a significant governmental interest, and that they

17  leave open ample alternative channels for communication of the information.'"  Ward v.

18  Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. for Creative

19  Non–Violence, 468 U.S. 288, 293 (1984)).  Accordingly, both federal law and California

20  law hold that permissible restrictions on expression in a public forum must be

21

22      [10] That said, it bears repeating that this decision is limited to leafleting inside of a private event.
Nothing in the Guidelines or Rules precludes any individual from engaging in one-on-one conversations

23  within an event he or she has lawfully entered according to the hosting party's requirements (i.e., tickets,
searches, etc.).

24
        [11] Given the lack of directly on-point, binding authority, it is worth noting that this conclusion is also

25  compelled by common sense.  One would not expect a private party paying to host its own exclusive event
would do so if it was advised that its exclusivity was illusory since ticket holders would be permitted to

26  engage in unfettered leafleting within the venue on the host's dime.

27      [12] At the very least, the free expression zones themselves would qualify as "designated public
fora."  See Hopper, 241 F.3d at 1074.  Because the Court concludes that the remainder of the property

28  outside of the gates is a public forum, however, it need not evaluate how this designation might change
the analysis.

1   (1) content-neutral, (2) narrowly tailored to achieve an important government interest,

2   and (3) leave open ample alternative communication channels.  Galvin v. Hay, 374 F.3d

3   739, 746 (9th Cir. 2004).  Although Plaintiff alludes to problems with the Guidelines as it

4   pertains to content, he concedes for purposes of this Motion that the Court may presume

5   the Guidelines are content-neutral.  Accordingly, the Court need only analyze the

6   remaining prongs of the above test.

7                    **a.    Significant Governmental Interest**

8        "A valid time, place, and manner regulation must 'serve a significant government

9   purpose.'"  Heffron, 452 U.S. at 649 (quoting Virginia Pharmacy Board v. Virginia Citizen

10  Consumer Council, 425 U.S. 748, 771 (1941)).  Here, the Guidelines evidence

11  Defendants' significant interest in public safety.  Specifically, the relevant portion of the

12  Guidelines provides: "the buildings and grounds comprising Cal Expo's grounds are

13  generally surrounded by parking areas . . . which areas become congested with

14  numerous vehicles during events . . . pedestrian traffic is generally confined to narrow

15  walkways to and from these parking areas to the various gates."  ECF No 12-1 at 102-3.

16  Due to the physical composition of Cal Expo, obstruction of these narrow walkways

17  clearly presents a significant safety risk to pedestrian attendees.  See ECF No. 9-4,

18  Ex. E, Pickering Decl. at ¶ 15-16.  Therefore, Defendants have a significant interest in

19  maintaining public safety on the Cal Expo premises outside of its gates.  See Heffron,

20  452 U.S. at 650; Kuba, 387 F.3d at 858.

21                         **b.    Narrow Tailoring**

22       "[A] regulation of the time, place, or manner of protected speech must be narrowly

23  tailored to serve the government's legitimate, content-neutral interests, but . . . it need

24  not be the least restrictive or least intrusive means of doing so."  Ward, 491 U.S. at

25  798.  "Nevertheless, the restriction must (1) 'promote[ ] a substantial government interest

26  that would be achieved less effectively absent the regulation,' and (2) must not 'burden

27  substantially more speech than is necessary to further the government's legitimate

28  interests.'"  Kuba, 387 F.3d at 861 (quoting Ward, 491 U.S. at 799.

                                        14

1  Here, the Guidelines and free expression zones afford speakers peak access to

2  event attendees because the zones are located at the entrance/exits that all "patrons

3  funnel in through."  ECF No. 9-1 at 15; see also ECF No. 9-4, Ex. E, Pickering Decl. at

4  ¶ 16; see generally, id, Ex. D and ECF No. 15-3, Ex. A.  Moreover, the record supports

5  Defendants position that "the locations of [the] free expression zones provides persons

6  with optimal access to the public entering . . . events such as the Hmong New Year

7  Festival, as they are within a few feet of all patrons, coming and going through the

8  admission/exit gates."  ECF No. 9-4, Ex. E, Pickering Decl. ¶ 17.  "At the same time, the

9  speakers are not in the immediate path of the flow of the heavy pedestrian traffic that

10  occurs during any event."  Id.  The Court thus concludes that the free expression zones

11  are narrowly tailored to serving Defendants' interest in public safety.

12  **c.  Ample Alternative Channels of Communication**

13  Finally, to be constitutional under a reasonable time, place, and manner analysis,

14  a regulation must "leave open ample alternative channels of communication of the

15  information."  Ward, 491 U.S. at 791.  Defendants argue that the free expression zones

16  established under the Guidelines provide ample alternative channels of communication

17  because the zones are located at the entrance points, which "create a bottleneck" so

18  "the speaker may reach a high volume of people from just staying in one location."  ECF

19  No. 9-1 at 16.  Plaintiff argues that the free expressions zones are not ample alternatives

20  because the speakers are "required to choose a 6' x 6' area on one side of the wide

21  gates . . . estimated . . . to be 70 or 80 feet across."  ECF No. 16 at 17 (internal citations

22  omitted).

23  However, as discussed above, the free expression zones are located right next to

24  the entrances/exits and are designed for optimal access to Cal Expo attendees.

25  Speakers can reach their intended audience as if they were standing elsewhere in the

26  ///

27  ///

28  ///

1    particular area of Cal Expo outside of the Venue in which the public is invited.[13]

2    Moreover, individuals are only confined to the free expression zones to conduct "free

3    speech activities," such as leafleting or soliciting.  They remain free to engage in one-on-

4    one conversations anywhere on Cal Expo property so long as if they wish to do so inside

5    the Cal Expo gates, they comply with the conditions of the event they are attending (i.e.,

6    consent to a search, buy a ticket, etc.).  Accordingly, because speakers are provided

7    optimal access to Cal Expo attendees while still maintaining public safety, this Court

8    finds that the Guidelines, through the free expression zones, provide ample alternative

9    channels of communication.  Given the foregoing, the Court concludes that the

10   enforcement of the free expression zones is permissible. [14]

12                                    **CONCLUSION**

14          For the aforementioned reasons, the parties' Motions for Summary Judgment

15   (ECF Nos. 9, 11) are both GRANTED in part and DENIED in part consistent with the

16   foregoing.

17          IT IS SO ORDERED.

18   DATED:  May 25, 2022

20   MORRISON C. ENGLAND, JR
     SENIOR UNITED STATES DISTRICT JUDGE

23   _____

24          [13] Plaintiff's briefing argues that speakers are prohibited from "nearly all free speech on
     [Cal Expo's] millions of other square feet."  ECF No. 16 at 17.  Given that the Court is evaluating the free
25   expression zones without reference to the interior gated portion of the property, that argument is
     unpersuasive.

26          [14] Defendant Pickering's liability is only implicated, according to Plaintiff, to the extent he is
     identified in the Guidelines as establishing the location of the free expression zones and because he
     ratified Plaintiff's ejection for leafleting inside the gates.  Plaintiff has not provided evidence linking
27   Pickering to any individual registration requirement.  Because Defendants' Motion is well taken on the first
     two points, Pickering's Motion for Summary Judgment is granted in its entirety for lack of a constitutional
28   violation.